[No. E044869. Fourth Dist., Div. Two. Aug. 7, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL NEUMAN, Defendant and Appellant.

## COUNSEL

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Scott C. Taylor and Marissa Bejarano, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RAMIREZ, P. J.**—A jury convicted defendant of committing lewd and lascivious acts on a minor (Pen. Code, § 288, subd. (a)).[1] He was granted probation. He appeals, claiming the trial court erroneously denied his _Wheeler/Batson_[2] challenge to the prosecutor's use of peremptories. We disagree and affirm. The facts surrounding defendant's conviction are irrelevant to this appeal.

### ISSUE AND DISCUSSION

The prosecutor exercised his first peremptory challenge against a Hispanic prospective juror. He exercised his second against an African-American prospective juror. His third was against a prospective juror defense counsel asserted was Latino, based only on his accent.[3] The trial court later concluded that his accent was not that of a Hispanic, but of someone from the South, with which defense counsel appeared to agree. The court said it had no idea what this person's ethnicity was and defense counsel failed to make any assertion in response.[4] The prosecution's fourth peremptory was exercised against a person who the trial court guessed, based on her name only,[5] was Southeast Asian.[6] After this, defense counsel challenged the prosecutor's use of peremptories under _Wheeler/Batson_, claiming all four had been used against "people of color." Counsel added that none of these prospective jurors said anything "that would indicate that they couldn't be fair to the People."

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] _People v. Wheeler_ (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748] (_Wheeler_); _Batson v. Kentucky_ (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712] (_Batson_).

[3] The man's last name was Bloom.

[4] By the time it made its motion for a new trial based, inter alia, upon the denial of its _Wheeler/Batson_ challenge, the defense had excluded this prospective juror from its discussion of the propriety of the trial court's ruling.

[5] Her last name was Ng.

[6] Defense counsel had asserted that she was Middle Eastern.

The trial court denied the challenge, finding, "I don't think that comprises a cognizable group . . . ."[7] The court did not contradict the prosecutor when he then said that the court had denied the challenge because the defense had not made out a prima facie case of prohibited discrimination. During the hearing on the motion for a new trial, which was based in part on this ruling, the trial court elaborated on its reasons for the denial thusly, " '[P]eople of color' is not really a cognizable group . . . and that's why I did not invite the district attorney to go to step two to justify his . . . peremptory challenges." After defense counsel agreed with the court that "people of color" was not a cognizable group and the defense's use of it was a "poor choice of words," he asserted that during the discussion of the *Wheeler/Batson* challenge, "it was agreed" that one African-American, one Hispanic and one Southeast Asian were removed and each of these belonged to a cognizable group. The trial court then said, "And you have one peremptory challenge as to each cognizable group. It doesn't seem to me that that makes out a case for the use to exclude a cognizable group. You either look at the pattern of three and then start talking about people of color, which I don't think is a cognizable group[,] or you look at one and one and one. And while I don't disagree that the use of any peremptory challenge for a discriminatory reason . . . runs afoul of *Wheeler*, it's hard for me to believe that you can establish the foundation for that argument where you have only a single challenge as to each of three different cognizable groups." After defense counsel repeated that a single misuse of a peremptory challenge violated *Wheeler/Batson*, so that if the prosecutor's use against any one of the three violated the prohibition, the challenge should have been successful, the trial court said, "[I]sn't the usual pattern in a *Wheeler* situation one in which one side . . . exercises peremptory challenges, for example, to Asians? And if there is a [peremptory] challenge to a single Asian, perhaps our sensibilities are aroused but that's about all. If [there are peremptory challenges] to two Asians and there are no other Asians on the jury, then perhaps we have a . . . talk about whether they're being used for that purpose. And if we had, for example, three Asians [excused with peremptories] and they [had been] all the Asians [that were prospective jurors], then would be the time when I would say to the prosecutor, ['] . . . now you've got to explain why [you excused] three Asians.['] [¶] But I . . . don't think I've ever heard of a situation in which . . . the first step of *Wheeler* is invoked by the use of a single peremptory challenge. It's just hard for me to concede how that raises a suspicion that the . . . challenge is being used discriminatorily." Defense counsel asserted that making a prima facie showing of discriminatory intent could be based not only on a prosecutor excusing more than one member of a cognizable

---

[7] The trial court denied the prosecutor's request to state nonracial reasons for his peremptories "out of an abundance of caution."

group, but also on excusing one member who appears, on the surface, to be an appropriate candidate for the jury. The trial court denied the motion without further comment.

Defendant begins his attack on the trial court's denial of his *Wheeler/Batson* motion by asserting that that court erred as a matter of law in concluding that all minority members could not be combined to create a single cognizable group. In support, he cites five federal court decisions: *Green v. Travis* (2d Cir. 2005) 414 F.3d 288 (*Green*), *Fernandez v. Roe* (9th Cir. 2002) 286 F.3d 1073 (*Fernandez*), *Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351 (*Kesser*), *Montiel v. City of Los Angeles* (9th Cir. 1993) 2 F.3d 335 (*Montiel*) and *U.S. v. Stephens* (7th Cir. 2005) 421 F.3d 503 (*Stephens*). Only one of those cases, however, supports his position.

In *Green*, the Second Circuit interpreted *Powers v. Ohio* (1991) 499 U.S. 400 [113 L.Ed.2d 411, 111 S.Ct. 1364] (*Powers*) as "dramatically lessen[ing] the import of *Batson*'s 'cognizable racial group' language . . . by holding that a criminal defendant has third-party standing to raise the equal protection claims of venirepersons who have been peremptorily excluded from a . . . jury on account of purposeful racial discrimination, even if the defendant and the peremptorily excluded venirepersons were not of the same race." (*Green, supra*, 414 F.3d at p. 297.) This, along with the holding of *Powers* that the racially discriminatory peremptory challenge of one prospective juror, standing alone, violates the equal protection clause, led the Second Circuit to reject the contention that a defendant does not have to show that all venirepersons who were peremptorily excused belonged to the same " 'cognizable racial group.' " (*Green, supra*, at p. 297.) It added, "*Powers* makes clear that the only continuing relevance of *Batson*'s 'cognizable racial group' language is the requirement that a defendant alleging purposeful racial discrimination . . . must demonstrate that a peremptorily excused venireperson was challenged by reason of being a member of *some* 'cognizable racial group.' . . . [O]ne venireperson cannot be excluded from a jury on account of race. *A fortiori*, several venirepersons of different races cannot be excluded from a jury on account of race." (*Id.* at pp. 297–298.)

The other cases defendant cites do not stand for the proposition that, as a matter of law, all minority members must be combined into one group for purposes of a *Wheeler/Batson* motion. In *Fernandez, supra*, 286 F.3d 1073, the defendant first challenged the peremptory excusal of four Hispanic prospective jurors, then of both of the African-Americans on the venire, and each time, the trial court found that a prima facie case had not been made. (*Id.* at pp. 1075–1076.) Although during the second motion, the defendant claimed that the prosecutor was excluding " 'people of color' " (thus seeming to combine both groups), the trial court denied the motion finding there had

been no prima facie showing of discrimination against *African-Americans*. (*Id.* at p. 1076.) The Ninth Circuit did not hold, as a matter of law, that members of the two groups could be combined for purposes of making a prima facie case. Rather, it performed a de novo review of the findings that no prima facie *cases* had been made thusly, "In applying *Batson* to this case, we focus first on the prospective Hispanic jurors. . . . The prosecutor struck four out of seven . . . Hispanics, . . . thus supporting an inference of discrimination. . . . Those challenges, standing alone, are enough to raise an inference of racial discrimination. [¶] Focusing next on the African-American venirepersons, we note that the prosecutor struck the only two prospective African-American jurors. Two challenges out of two venirepersons are not always enough to establish a *prima facie* case. Because the numbers are so small (and, hence, potentially unreliable) two such challenges, standing alone, may not be sufficient to support an inference of discrimination. [Citations.] In this case, however, the two challenges against African-Americans do not stand alone. Under *Batson*, we must consider 'all relevant circumstances' surrounding the challenges. [Citation.] Even before the prosecutor struck the first African-American venireperson . . . , the prosecutor's prior use of peremptory challenges against the prospective Hispanic jurors had given rise to a *prima facie* case of racial discrimination. [¶] Given the circumstances— that the prosecutor's behavior had already supported an inference of discrimination and that the trial court had expressly warned him against striking any more Hispanics—the prosecutor's subsequent strikes against the only two African-American venirepersons also support an inference of racial discrimination. [¶] . . . [¶] . . . Because a pattern of strikes against prospective jurors *of a particular race* can give rise to an inference of discrimination, see *Batson*, . . . and because the statistical disparities here indicate such a pattern, . . . we find that [defendant] has established a *prima facie* showing of discrimination under *Batson*." (*Id.* at pp. 1078–1080, some italics added, citation omitted.)[8]

*Kesser, supra*, 465 F.3d 351, does not even involve a review of the trial court's determination whether a prima facie case had been made. Rather, the appellate court examined the trial court's subsequent finding that the prosecutor had offered race-neutral reasons for peremptorily excusing certain prospective jurors.[9] (465 F.3d at p. 361.) Although the Ninth Circuit concluded "[t]he racial animus behind the prosecutor's strike*s* is clear" and the excusals were "blatant race-based strike*s*" it went on to reverse on the basis that only

---

[8] The remarks of the trial court here are not at all inconsistent with the language in *Fernandez*.

[9] Specifically, the Ninth Circuit concluded, "The California Court of Appeal reviewed the *Batson* challenge and noted that the trial court had properly found exclusion of an identifiable group . . . ." (*Kesser, supra*, 465 F.3d at p. 356, italics added.) Thus, the trial court concluded that a prima facie case had been made and the prosecutor then offered explanations for his peremptory excusals.

one of the three Native American prospective jurors at issue had been excused for racial reasons and it conceded that there may have been genuine race-neutral reasons in the record for the excusal of the other two and a women who was thought to be of Filipino ancestry. (*Id.* at pp. 357–358, 369, italics added.) The latter prospective juror was referred to only in the following context, "Although the evidence for a race-based strike of [the first Native American prospective juror] is overwhelming, we do not rely exclusively on her case alone. The evidence of the prosecutor's racial animus is most obvious with respect to [her], but it is also consistent with his treatment of the other two Native Americans and other minorities on the venire. . . . [¶] [However, b]ecause just one racial strike calls for a retrial, we will not determine here whether there [were] any genuine nonracial reasons for striking each of these jurors . . . . It is important to note, [at the same time,] that the prosecutor offered several pretextual explanations for these strikes, and this undercuts his credibility." (*Id.* at pp. 368–369.) The appellate court went on to note, "A *Batson* challenge to the prosecutor's removal of [the prospective juror of Filipino ancestry] is not before us. The trial court did not find that a prima facie case of racial or ethnic bias had been made in her case . . . . Nevertheless, at least some of [the prosecutor's] testimony about [her] is relevant here, because it indicates possible racial animus and so lends support to [defendant's] argument that the prosecutor employed racial stereotypes throughout the jury selection." (*Id.* at p. 369, fn. 6.)

Earlier, in *Montiel, supra,* 2 F.3d 335, the Ninth Circuit had dealt with a challenge to the defendant's use of peremptories to excuse every Spanish-surnamed prospective juror in the venire and another against an African-American. (*Id.* at p. 339.) The defendant offered explanations for the three Hispanics, which the trial court accepted. The African-American was not mentioned. After the defendant used another peremptory to excuse yet another African-American, the plaintiff made a second motion, which the trial court summarily denied without hearing argument or asking for an explanation from the defendant. (*Ibid.*) The Ninth Circuit did not order a new trial due to the trial court's ruling on the first challenge (to the three Hispanic prospective jurors), nor did it combine the Hispanic and African-American jurors to make a cognizable group of members of minorities for a review of the propriety of the finding that no prima facie case had been made. Rather, it held that the trial court's failure to hold a hearing on the second challenge (to the second excused African-American prospective juror) required a new trial. (*Id.* at pp. 340–341.)

Finally, in *Stephens, supra,* 421 F.3d 503, the Seventh Circuit merely followed *Fernandez*'s use of excusals against members of a second minority group as evidence to support a prima facie showing of discrimination against members of a first minority group, as part of the " 'relevant circumstances' " the trial court should consider in making such a determination. (*Stephens,*

*supra*, at p. 513.) The Seventh Circuit did not hold that the two groups are to be combined into one large group in making a prima facie showing. In fact, it turned to the matter of the excusal of three Hispanics and one Asian only because the excusal of two African-Americans created a pattern that, because of the small number involved, was difficult to detect. (*Ibid.*) In examining the non-African-American minority excusals, the Seventh Circuit noted that 75 percent of the Hispanics and 100 percent of the Asians in the venire at the time had been excused. (*Id.* at pp. 513–514.) It noted as even more compelling than this was the fact that the prosecutor used no peremptories against Caucasians. (*Id.* at p. 514.)

Therefore, of the five cases defendant cites, only one, from the Second Circuit, arguably supports his assertion that the trial court here committed an error of law in not combining the three excused jurors to create one large group, i.e., members of racial minorities.

■ On the other hand, the California Supreme Court recently addressed the "[d]efendant fault[ing] the trial court for overruling his objection to the prosecution's use of peremptory challenges to exclude seven 'people of color' (five Hispanic-surnamed [potential] jurors, one . . . Chinese-American [potential] juror and one . . . African-American [potential] juror) and ruling that defendant had failed to make a prima facie showing that the prosecutor had challenged the Hispanic-surnamed jurors because of group bias." (*People v. Davis* (2009) 46 Cal.4th 539, 582 [94 Cal.Rptr.3d 322, 208 P.3d 78] (*Davis*).) Our high court noted, "The trial court concluded that 'people of color' was not a cognizable group for *Wheeler* analysis, and instead focused on the Spanish-surnamed [prospective] jurors as a cognizable group . . . . [It] ruled that defendant had failed to establish a prima facie case that the prosecution's exercise of peremptory challenges was motivated by group bias." (*Id.* at p. 583.) The Supreme Court held, "[W]e reject defendant's contention that the trial court erred by ruling that 'people of color' is not a cognizable group for *Wheeler* analysis. No California case has ever recognized 'people of color' as a cognizable group." (*Ibid.*)

During oral argument, defendant acknowledged the holding in *Davis*, but urged that because it was based on *Wheeler* and not *Batson*, we should follow the Second Circuit's holding in *Green*. We note that defendant failed to explain the difference between *Wheeler* and *Batson* as they apply to this issue. We also note that the Second Circuit in *Green* did not base its holding on *Batson*, but on its own interpretation of language in *Powers*. Unlike *Davis*, *Green* does not bind us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]; *People v. Burton* (1989) 48 Cal.3d 843, 854 [258 Cal.Rptr. 184, 771 P.2d 1270].)

Having disposed of defendant's argument that the trial court erred, as a matter of law, in concluding that "people of color" is not a cognizable group for purposes of a *Wheeler/Batson* motion, we now determine whether the trial court otherwise erred in concluding that defendant failed to make a prima facie showing of purposeful discrimination by the prosecutor in his use of peremptories.

■ "Subject to rebuttal, a presumption exists that a peremptory challenge is properly exercised, and the burden is upon the opposing party to demonstrate impermissible discrimination against a cognizable group." (*People v. Salcido* (2008) 44 Cal.4th 93, 136 [79 Cal.Rptr.3d 54, 186 P.3d 437] (*Salcido*).) "[T]he burden rests on the defendant to ' "show[] that the totality of the relevant facts gives rise to an inference of discriminatory purpose." ' [Citations.] . . . [¶] . . . [A] prima facie burden is simply to 'produc[e] evidence sufficient to permit the trial judge to draw an inference' of discrimination. [Citation.]" (*People v. Carasi* (2008) 44 Cal.4th 1263, 1292–1293 [82 Cal.Rptr.3d 265, 190 P.3d 616] (*Carasi*).) "[W]e review the trial court's denial of a *Wheeler/Batson* motion deferentially, considering only whether substantial evidence supports its conclusions." (*People v. Bonilla* (2007) 41 Cal.4th 313, 341 [60 Cal.Rptr.3d 209, 160 P.3d 84] (*Bonilla*).)[10] As defendant, himself, states, we examine the entire record for evidence to support the trial court's ruling[11] and, "If the record 'suggests grounds upon which the prosecutor might reasonably have challenged' the [prospective] jurors in

[10] Prior to *Johnson v. California* (2005) 545 U.S. 162 [162 L.Ed.2d 129, 125 S.Ct. 2410] (*Johnson*), a defendant challenging a peremptory excusal had to show that it is more likely than not that the use, if unexplained, was based on impermissible group bias. (*Id.* at p. 169.) Since *Johnson*, the standard has been as articulated in the text of this opinion. Here, the trial court ruled on defendant's challenge two years after *Johnson* was decided. "Absent some evidence to the contrary, we are entitled to presume that . . . months after *Johnson* the trial court knew and applied the appropriate law governing a *Wheeler/Batson* motion. [Citations.]" (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 503 [69 Cal.Rptr.3d 25].) Indeed, in *Salcido, supra,* 44 Cal.4th at pages 136–137, the California Supreme Court held, "Ordinarily, we apply a deferential standard of review to the trial court's denial of a defendant's *Wheeler/Batson* motion, considering only whether the ruling is supported by substantial evidence . . . . [¶] . . . [W]e recognize[] that a different standard of appellate review is required in cases *predating Johnson* in which the trial court determined the defendant failed to make a prima facie case of group discrimination. [In those cases,] . . . we may not accord deference to the trial court's finding that no prima facie case has been made, but must be satisfied from our independent review of the record that the defendant has made an insufficient showing at the onset to permit an inference of discrimination." (Citations omitted, some italics added.) It is notable that this less deferential standard was applied in *Carasi.* (*Carasi, supra,* 44 Cal.4th at p. 1293.) Even if the more stringent standard is applied, our task is to review the record " 'and resolve the legal question whether the record supports an inference that the prosecut[ion] excused a [prospective] juror on the basis of race.' " (*People v. Hoyos* (2007) 41 Cal.4th 872, 901 [63 Cal.Rptr.3d 1, 162 P.3d 528] (*Hoyos*).)

[11] Thus, we are puzzled why, during oral argument, appellate counsel for defendant criticized this court's examination of the entire record, rather than our considering only those facts that existed at the moment the motion was made.

question, we affirm. [Citation.]" (*People v. Howard* (1992) 1 Cal.4th 1132, 1155 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) What defendant seems to fail to appreciate is that the foregoing encompasses *two different ways* in which we may uphold the trial court's denial of a *Wheeler/Batson* challenge. First, we uphold the denial if an examination of the relevant statistics and pattern of the excusals,[12] or other facts, such as whether defendant is also a member of the group excused, the prosecutor engaged in desultory or no questioning of the prospective jurors in question and whether their only commonality is their membership in a cognizable group (*Wheeler, supra*, 22 Cal.3d at pp. 280–281), provide substantial evidence to support the trial court's finding that a prima facie case has not been made, as in *Carasi, supra*, 44 Cal.4th at pages 1294 and 1295 and *People v. Kelly* (2007) 42 Cal.4th 763, 780 [68 Cal.Rptr.3d 531, 171 P.3d 548] (*Kelly*). *In addition to this*, we affirm by examining the record for race-neutral grounds upon which the prosecutor might have challenged the prospective jurors in question. (*Davis, supra*, 46 Cal.4th 539; *Carasi, supra*, 44 Cal.4th at p. 1295, fn. 17; *id*. at p. 1321 (conc. & dis. opn. of Kennard, J.); *Hoyos, supra*, 41 Cal.4th at p. 901, fn. 15 ["[w]e need not reach [defendant's contention that the trial court's ruling deserves no deference], because as explained below, our conclusion that defendant did not make a prima facie showing is based on our review of the record, not on deference to the trial court's ruling or reasoning"]; *People v. Lancaster* (2007) 41 Cal.4th 50, 76 [58 Cal.Rptr.3d 608, 158 P.3d 157] (*Lancaster*); *People v. Avila* (2006) 38 Cal.4th 491, 554 [43 Cal.Rptr.3d 1, 133 P.3d 1076] (*Avila*) [although trial court found no prima facie showing because it was under the impression that only a pattern of discrimination, revealed in multiple excusals, would suffice, California Supreme Court upholds finding because record reveals race-neutral reasons for excusals]; *Bonilla, supra*, 41 Cal.4th 343–359; see, e.g., *People v. Howard* (2008) 42 Cal.4th 1000, 1017, 1019 [71 Cal.Rptr.3d, 175 P.3d 13].)[13]

Even if we assume, for purposes of this discussion only, that members of several cognizable groups can be considered together to form a cognizable group,[14] defendant still may not prevail.

---

[12] For example, the defendant may show that the prosecutor has struck most or all of the members of a cognizable group or groups or used a disproportionate number of peremptories against members of a group or groups. (*Wheeler, supra*, 22 Cal.3d at pp. 280–281.)

[13] Thus, defendant's suggestion that if the trial court erred in failing to find a prima facie case based on statistical and/or pattern analysis or that it erred in requiring a pattern to be established, we must reverse regardless of the presence of race-neutral reasons for excusing these prospective jurors, is incorrect. (See, e.g., *Avila, supra*, 38 Cal.4th at pp. 554–556.)

[14] In addition to our Supreme Court's disapproval of this, we also note that in this portion of our part of the State of California, combining all members of minority groups may obliterate their status as members of a group that is in the minority.

Even though he had an opportunity both when he made his *Wheeler/Batson* objection and, after conviction, during his motion for a new trial,[15] to state other facts supportive of his challenge which are not apparent to this court on the cold record before us, defendant did not.[16] Thus, we are left with only the facts that the prosecutor used three of his first four peremptories (or three of his total of five) against members of cognizable groups and, in the opinion of defense counsel, none of them said anything that would indicate that they could not be fair to the People. Defendant has deprived us of our ability to determine if the record contains substantial evidence to support the trial court's finding that no prima facie case had been made based on statistics and the pattern of peremptory challenges.[17] However, we note that even the cold record tells us that defendant is a Caucasian, thus, not a member of any of the groups to which the prospective jurors at issue belong, a factor which supports the trial court's ruling. (*Kelly, supra*, 42 Cal.4th at p. 779.)[18] Also supportive of the trial court's ruling are the facts that the prosecutor did not engage in desultory voir dire of these prospective jurors and they did not share only the characteristic of being a member of a cognizable group and were otherwise as heterogeneous as the community as a whole. (*Kelly*, at p. 779.) They all were young college students, relatively inexperienced in life. Unlike many of the cases defendant cites in support of his position which address the statistical aspects of the exercise of peremptories, and/or the pattern they created, his failure to make a record below deprives us of any opportunity to know how many members of a cognizable group were

---

[15] In connection with his new trial motion, defendant filed a written motion and a written reply to the People's opposition to his motion, and counsel argued at the hearing on the motion. Defendant's assertion, in his reply brief, that he did not make an adequate record below because he was somehow stymied by the trial court's erroneous denial of his *Wheeler/Batson* challenge would be more persuasive had he not based his motion for a new trial in part on this denial and accorded himself yet a second opportunity to provide the statistical facts that would have supported his challenge.

[16] It is the People who supply us with the fact that the prosecutor exercised a total of five peremptories.

[17] In *People v. Bell* (2007) 40 Cal.4th 582, 599, 600 [54 Cal.Rptr.3d 453, 151 P.3d 292] (*Bell*), the California Supreme Court upheld the trial court's finding that no prima facie case of discrimination had been made where the prosecutor excused two Filipino-Americans and two asserted lesbians because, inter alia, "the record . . . fails to show how many other Filipino-Americans [and lesbians] were in the venire and were not challenged by the prosecutor." (Accord, *Avila, supra*, 38 Cal.4th at p. 555 [the fact that several African-American prospective jurors were in the venire at the time the only African-American in the jury box was peremptorily excused by the prosecutor supports the trial court's finding of no prima facie case].)

[18] Other evidence which is especially relevant includes whether the prosecutor excused most or all members of a cognizable group or groups or used a disproportionate number of peremptories against such members. (*Kelly, supra*, 42 Cal.4th at p. 779.) We cannot know the former because defendant failed to make a record below. Although the prosecutor used three of his five peremptories against members of minority groups, other factors, which we discuss, weigh in favor of the trial court's ruling.

prospective jurors at the time of the challenge and how many ended up serving on the jury.[19] Defendant does not mention how many additional peremptories were exercised by the prosecutor against such members. Thus, he cannot equate the facts here to those in cases in which the prosecutor has struck most or all the members of a cognizable group or groups. (*Wheeler, supra,* 22 Cal.3d at pp. 280–281; *Kelly, supra,* 42 Cal.4th at pp. 779–780.) Additionally, defendant's assertion that the prosecutor exercised 75 percent of his peremptories against members of a cognizable class freezes the record at the time of the motion, ignores everything that happened thereafter (which cannot now be reconstructed, thanks to defendant's failure to make a record below) and flies in the face of the rule that we examine the *entire* record.

■ *People v. Turner* (1986) 42 Cal.3d 711 [230 Cal.Rptr. 656, 726 P.2d 102], which defendant cites in support of his assertion that a prima facie case is made out if the prosecutor uses two of his first five peremptories against members of a cognizable group, is distinguishable on its facts. In *Turner,* a capital case, the prosecutor excused the only two African-Americans who were then in the box, and it was noted that there were only two other African-Americans who remained as prospective jurors amongst the 90 or so who were assembled. (*Id.* at p. 718.) The defendant was African-American and his victims were Caucasian. (*Id.* at p. 714.) Because the trial court asked the prosecutor for explanations for his excusals, the California Supreme Court concluded that the trial court impliedly found that the defendant had made out a prima facie case. (*Id.* at p. 719.) The high court concluded that such a finding was supported, noting that the prosecutor had used two of his first five peremptories on African-Americans *and* they had only their race in common—that they were of different genders and marital status, lived in different communities and had different occupations, and the defendant was African-American and the victims were Caucasian. (*Ibid.*) The court said, "*The combination of these factors* establishes a prima facie case of group discrimination." (*Ibid.,* italics added.) This is clearly unlike the situation here, where all three prospective jurors were young students, inexperienced at life. Moreover, the record does not show that there were very few prospective jurors that were members of cognizable groups left in the jury pool at the time of the challenge. In fact, the record indicates otherwise. Additionally, defendant was not a member of any of the cognizable groups to which these prospective jurors belonged.

In *Williams v. Runnels* (9th Cir. 2006) 432 F.3d 1102 (*Williams*), which defendant also cites, the African-American defendant challenged the prosecutor's use of three of his first four peremptories against African-American

---

[19] See *Paulino v. Castro* (9th Cir. 2004) 371 F.3d 1083 (*Paulino*), described in footnote 21, *post,* pages 587–588.

venirepersons where only four of the first 49 prospective jurors were African-American. (*Id.* at pp. 1103, 1107.) The Ninth Circuit declared this to be a statistical disparity, which the appellate court had previously held alone could create a prima facie showing (although it noted that other facts could dispel the presumption). (*Id.* at p. 1107.) Here, in contrast, there is nothing on the record before us showing the number of African-Americans, Hispanics and Asians that were in the venire at the time this challenge was made, hence, *there was no showing of a statistical disparity.* Moreover, there were other circumstances that dispelled any inference of discrimination, as already discussed above. Therefore, *Williams* is not authority for a finding that the trial court erred here. Finally, as an aside, the Ninth Circuit in *Williams* went on to hold that the inference of discrimination raised by a statistical disparity cannot be rebutted by race-neutral reasons appearing on the record. (*Id.* at p. 1108.) Whether the Ninth Circuit meant that a trial court may not rely on race-neutral reasons in the record to dispel an inference of discrimination created by a statistical disparity, or an appellate court may not use such reasons to uphold a trial court's finding that no prima facie case has been made, both positions are contrary to holdings by the California Supreme Court, which bind us. (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d 450.)

In *Green, supra,* 414 F.3d 288, also cited by defendant, the prosecutor used his first five peremptories against minority prospective jurors, leaving no African-Americans on the venire at that point. (*Id.* at pp. 291–299.) The Second Circuit concluded that the pattern of the prosecutor's peremptories established a prima facie case. (*Id.* at p. 299.) Here, in contrast, only three minority prospective jurors had been excused and the record shows that minority jurors remained on the venire at the time.

In *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807 (*Turner*), which defendant cites, the prosecutor's use of five of his nine peremptories to excuse five of nine African-Americans on the venire created a pattern which provided support for an inference of discrimination, where the defendant was also African-American. (*Id.* at pp. 811–812.) The Ninth Circuit noted that the prosecutor "[excused] a significant proportion of the available African-American venirepersons" and "used a significant percentage of its peremptory challenges against African-Americans." (*Id.* at p. 813.) Not only were fewer minority members dismissed here, but, unlike in *Turner*, it cannot be determined here whether the prosecutor used his peremptories against a significant proportion of minority venirepersons or used a significant portion of his peremptories against minority venirepersons because the defense failed to make a record. The *Turner* court also noted that African-Americans made up 30 percent of the venire, yet the prosecutor used 56 percent of his peremptories against them, "a disparity" which the Ninth Circuit concluded "supports an inference of discrimination." (*Ibid.*) Here, it cannot be known what

percentage of the venire was minority and what percentage of the prosecutor's peremptories were used against minority members. It is also notable that *Turner* was overruled to the extent that it did not apply the statutory presumption of correctness of the trial court's determination that a prima facie case had not been made. (*Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 685.)

Finally, in *Montiel, supra,* 2 F.3d 335, as already stated, the defendant used three of its seven peremptories against Hispanics, eliminating all Hispanics from the venire, and two of the seven against African-Americans, leaving only one in the venire. (*Id.* at pp. 339–340.) The trial court summarily rejected the plaintiff's challenge to the excusal of the second African-American prospective juror, making no finding whether a prima facie case had been made and asking for no explanation by the defense. As already discussed, the Ninth Circuit faulted the trial court for failing to conduct a *Wheeler/Batson* inquiry into the excusal of this venireperson. (*Montiel, supra,* at p. 340.) Here, there is no basis for concluding that the prosecutor used a certain percentage of his peremptories against minority members. Additionally, the trial court conducted an appropriate *Wheeler/Batson* hearing.

Certainly, the law does not support defendant's faultfinding with the trial court's comments during the motion for a new trial about the absence of a pattern of discriminatory intent and its impact upon its finding that no prima facie case had been made. Very recently, in *People v. Hamilton* (2009) 45 Cal.4th 863, 899 [89 Cal.Rptr.3d 286, 200 P.3d 898], the California Supreme Court held, "[T]he [trial] court correctly looked for 'evidence from . . . which one might draw certain inferences' of discrimination, and found none. The court reasoned that a pattern of discrimination was circumstantial evidence from which one might draw inferences, but correctly rejected defendant's argument that the challenge of the only [African-American] subject to challenge was sufficient in and of itself to suggest a pattern. [Citing *Bonilla, supra,* 41 Cal.4th at pp. 342–343.]"

■ Indeed, in *Bonilla,* the California Supreme Court commented, " '[T]he ultimate issue . . . "is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." [Citation.] But in drawing an inference of discrimination from the fact one party has excused "most or all" members of a cognizable group' . . . 'a court finding a prima facie case is necessarily relying on an apparent pattern in the party's challenges.' [Citation.] Such a pattern will be difficult to discern when the number of challenges is extremely small." (*Bonilla, supra,* at p. 343, fn. 12.)

Additionally, the California Supreme Court held that the excusal of three out of four Hispanics, in a case where the defendant was also Hispanic, did

not necessarily create a prima facie case. (*Hoyos, supra*, 41 Cal.4th at p. 901.) In *Hoyos*, the high court held that the prosecutor's excusal of *all* members of a cognizable group may establish a prima facie case, but this fact alone is not conclusive to such a showing. (*Ibid.*)

In *Bonilla, supra*, 41 Cal.4th at page 343, the California Supreme Court rejected the defendant's contention that the excusal of both of the African-Americans in the jury pool of 78 people made out a prima facie case because " 'the small absolute size of this sample makes drawing an inference of discrimination from this fact alone impossible. ". . . As a practical matter, . . . the challenge of one or two jurors can rarely suggest a pattern of impermissible exclusion." ' [Citations.]" (Accord, *Bell, supra*, 40 Cal.4th at p. 598 [excusal of two out of three African-Americans did not create prima facie showing where small absolute size of sample makes drawing an inference of discrimination from this fact alone impossible].) The California Supreme Court reached the same conclusion about the prosecutor's excusal of three Hispanic females from the *Bonilla* jury, saying, "[Defendant] resumes th[e] argument [he made below] . . . that statistical evidence—the prosecution's exclusion of all three Hispanic women—alone establishes a prima facie case. We disagree. [¶] . . . [¶] [Defendant] offers no reason, beyond the ratio of Hispanics struck to those in the juror pool, to conclude the prosecutor discriminated against Hispanics or Hispanic women in his use of peremptories, and the record amply supports the trial court's conclusion that he failed to make a prima facie case . . . ." (*Bonilla, supra*, 41 Cal.4th at pp. 344–345.)

Finally, in *Lancaster, supra*, 41 Cal.4th at pages 73 and 76, the California Supreme Court labeled as "meager" the defendant's attempt to make a prima facie showing based only on his assertion that three African-American women had been peremptorily excused by the prosecutor and, in his opinion, all three were just the type of jurors both sides wanted. The Supreme Court added, ". . . [T]he [trial] court properly noted that the percentage of African-American women challenged by the prosecutor had not reached a level that suggested an inference of discrimination . . . ." (*Id.* at p. 76.)

Additionally, the record, indeed, suggests grounds upon which the prosecutor might have challenged each of these prospective jurors. The Hispanic female began voir dire by asking for a hardship excusal. She stated that she was concerned because she was a college student at California State University, Los Angeles, and her quarter lasted only 10 weeks. She added that she would have to "work something out" with her professors in order to serve on the jury. The trial court said that although it had never had occasion to write to professors at California State University, Los Angeles, it had written to instructors at the University of California at Riverside and Riverside Community College, and they had been cooperative in rescheduling assignments and exams. The court offered to write such letters to her professors and

in response to the court's inquiry whether that would "take care of" the situation, she said it would. When the panel was asked if any members knew anyone in law enforcement, she reported that her mother was a supervising probation officer in Orange County, after having been a "counselor for juvie." In answer to the trial court's question whether this would tend to make her believe the testimony of a law enforcement officer over another person, she said it would not and that her mother had taught her to be fair. She also reported that although her permanent address is in Lake Elsinore, where she shares a home with her mother and siblings, she lives at the dorms at California State University, Los Angeles, and works in Los Angeles as a shoestore manager. She had no children and had never before been on a jury. The facts that this prospective juror was a student, lacking a great deal of life experience, was living and working in another county and at a substantial distance from the courthouse, with a heavy academic schedule and a job, and that her mother had been involved for more than all of her life as a counselor and probation officer suggested grounds upon which the prosecutor would not want her on the jury, aside from the fact that she was Hispanic.

The African-American prospective juror was also a student at both Chaffey College in Upland and Santa Monica College in Los Angeles County.[20] She lived with her mother in Moreno Valley. She had no children and had never served on a jury. She reported that she and her sister were molested when she was six years old. When asked whether this would cause her to favor one side over the other, she replied, "I asked myself that question the entire time during the break, and I don't believe it would." However, later, she became much more unequivocal, saying, "I have this incredible ability of being impartial with everything that happened to me. It won't affect me emotionally or personally. It doesn't have anything to do with me at all." Defense counsel told the panel that when her father reads in the paper that someone has been arrested or charged with a crime, his reaction is, "[W]here there's smoke, there's fire" whereas hers, as a defense attorney, is that people are presumed innocent and the paper may omit certain crucial facts. She asked the panel whether they agreed more with her or with her father. This prospective juror responded, "I would side with you because I was recently the victim of media manipulation because they took something I said out of context and quoted me out of context." This prospective juror, like the one discussed above, was a student, living at home with her mother, with limited life experience. Like the one discussed above, she was attending school in another county at a distance even farther from the courthouse than the other. She gave somewhat conflicting answers to the question whether her own molestation would affect her ability to sit on this jury. Her second response showed a fair amount of bravado that could reasonably be off-putting to the prosecutor. Additionally,

---

[20] Contrary to the People's factual statement, she was not attending "Chaffey College in Santa Monica."

her statement about being manipulated by the media, on its face, appeared strange, and she offered no explanation as to how she came to be in this situation.

Finally, the Asian prospective juror lived in Corona and was a full-time student at the University of Redlands. She had just finished her freshman year, lived at home with her parents and sibling, had no children, had never been on a jury and her only job had been working on campus as an office assistant during the previous semester. As with the two previously discussed prospective jurors, her youth and limited life experience were grounds upon which the prosecutor might have challenged her.

Defendant's attempt, for the first time in his reply brief, to do a comparative analysis of these prospective jurors to others who served on the jury in an effort to demonstrate that the grounds we have cited are invalid is inappropriate in this, a "first step" *Wheeler/Batson* case. (See *Carasi, supra,* 44 Cal.4th at p. 1295; *People v. Howard, supra,* 42 Cal.4th at pp. 1019–1020.)

Defendant asserts that although California Supreme Court authority requires us to examine the record for reasons that might have justified the prosecutor's use of peremptories, this is contrary to certain language in *Johnson.* Specifically, defendant points to *Johnson*'s comment that, "The *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process. [Citation.] The inherent uncertainty present in inquiries of discriminatory purpose counsels against engaging in needless and imperfect speculation when a direct answer can be obtained by asking a simple question." (*Johnson, supra,* 545 U.S. at p. 172.)[21] However, defendant omits the next sentences in

---

[21] Johnson cited *Paulino, supra,* 371 F.3d 1083 and *Holloway v. Horn* (3d Cir. 2004) 355 F.3d 707, 725 (*Holloway*) in support of this proposition. Defendant's assertion to the contrary, neither case aids his position.

In *Paulino,* the prosecutor used five out of six total peremptories to excuse five out of six African-Americans. (*Paulino, supra,* 371 F.3d at p. 1089.) Defendant was also African-American. (*Id.* at p. 1090.) When defense counsel challenged this under *Wheeler/Batson,* the trial court completely "short circuited" the process and began hypothecating reasons for the excusal of each of the five, without seeking any explanation from the prosecutor. (*Paulino, supra,* at p. 1089.) The trial court then concluded that no prima facie case had been made because it could see the objective reasons for excusing each prospective juror. The trial court then allowed defense counsel to speak, and he asserted that the statistics created an inference of discrimination. The trial court agreed that, statistically, it " 'look[ed] bad,' " but added that because it could see why the prosecutor would want these people off the jury, a prima facie case had not been made. (*Ibid.*) The portion of the opinion the Supreme Court cites in *Johnson* deals with the Ninth Circuit's condemnation of the trial judge's "contravention" of the procedure outlined in *Batson,* its failure to allow the prosecutor to explain his reasons for exercising his peremptories and its consequent speculation as to what those reasons might be, rather than considering the "real reasons." (*Paulino, supra,* at p. 1090.) The Ninth Circuit went

*Johnson,* which are *"The three-step process* thus simultaneously serves the public purposes *Batson* is designed to vindicate and encourages 'prompt

on to find that the California Court of Appeal had used an incorrect standard (it used "strong likelihood") in determining whether the defendant had made a prima facie showing of discrimination; therefore, it refused to defer to the state court's "factual finding" that the showing had not been made and proceeded with a de novo review. (*Ibid.*) Relying on a case in which the removal of five out of nine African-Americans had, in its view, constituted a prima facie showing, the Ninth Circuit concluded that such a showing had been made here, as well. (*Id.* at p. 1091.) In so doing, the federal court noted that the People had offered no race-neutral reasons for the excusals on appeal. (*Ibid.*) The court then stated the following, which is completely inconsistent with defendant's position, "While we may consider whether 'the record contains entirely plausible reasons, independent of race, why' a prosecutor may have exercised peremptories, [citation] such reasons have usually helped persuade us that defendant made no prima facie showing where defendant challenged the excusal of just one juror. . . . [T]he absence of plausible reasons for the strike could be the 'more' that gives rise to an inference of bias. *If there are such reasons in the record, however, then it's difficult to say that defendant has raised an inference of bias.*" (*Id.* at pp. 1091–1092, italics added, citations omitted.)

In *Holloway,* the prosecutor ultimately used 11 out of 12 peremptories to excuse African-Americans in a case where the defendant was African-American and his guilt hinged on whether the jury believed him or a Caucasian police officer. (*Holloway, supra,* 355 F.3d at pp. 712, 723.) At a time when the prosecutor had used seven of eight peremptories against African-Americans, the defense objected. (*Id.* at p. 721.) Without making a finding whether defendant had made a prima facie showing, the trial court invited commentary from the prosecutor. He said that he had also excused a Caucasian prospective juror and two African-Americans remained on the venire. The trial court added that the defense, itself, had peremptorily excused an African-American. The prosecutor offered no explanation for his excusals. (*Ibid.*) The trial court said only that the defendant had excused an African-American and " 'the record will speak for itself.' " (*Ibid.*) Thereafter, the prosecutor exercised four more peremptories, all against African-Americans. (*Ibid.*) After each of the second, third and fourth of these, the prosecutor volunteered explanations. (*Id.* at pp. 721–722.) Relying on a holding in *Batson* that a pattern of strikes against prospective jurors belonging to a cognizable group might give rise to an inference of discrimination, the Third Circuit noted that the pattern here was "certainly strong" and concluded that the defendant had met his burden. (*Holloway, supra,* at p. 722.) The appellate court concluded that the prosecutor using a peremptory on a Caucasian prospective juror "did nothing to dispel [the defendant's] suggestion that the prosecutor harbored a discriminatory intent in striking the seven [African-Americans]." (*Id.* at p. 723.) The Third Circuit concluded that the trial court's finding that there was insufficient evidence to support a prima facie showing was "inconsistent with *Batson* and not fairly supported by the record." (*Ibid.*) The appellate court went on to conclude that the explanation offered by the prosecutor for excusing one of the prospective jurors at issue was pretextual, after doing a comparative analysis with those he did not excuse. (*Id.* at p. 724.) In discussing this explanation, the Third Circuit made the statements to which *Johnson* referred, specifically, that, on appeal, reinterpretation of or speculation about the prosecutor's explanation is prohibited, with review being limited to the reasons actually given. (*Holloway, supra,* at p. 725.)

Rather than being a condemnation of searching the record for reasons which would support the excusal of a prospective juror, *Paulino* endorses it. The language in *Holloway* on which the Supreme Court relied in *Johnson* addressed the third prong of *Wheeler/Batson,* not the first.

As the California Supreme Court held in *People v. Ward* (2005) 36 Cal.4th 186, 203 [30 Cal.Rptr.3d 464, 114 P.3d 717] and *People v. Turner* (1994) 8 Cal.4th 137, 168 [32 Cal.Rptr.2d 762, 878 P.2d 521], the ultimate composition of the jury is a factor to be considered in an appellate court evaluating a *Wheeler/Batson* challenge.

rulings on objections to peremptory challenges without substantial disruption of the jury selection process.' [Citation.] [¶] The disagreements among the state-court judges who reviewed the record in this case illustrate the imprecision of relying on judicial speculation to resolve plausible claims of discrimination. In this case the inference of discrimination was sufficient to invoke a comment by the trial judge 'that "we are very close," ' and on review, the California Supreme Court acknowledged that 'it certainly looks suspicious that all three [minority] prospective jurors were removed from the jury.' [Citation.] Those inferences that discrimination may have occurred were sufficient to establish a prima facie case under *Batson*." (*Johnson*, at pp. 172–173, italics added.) Indeed, in *Lancaster, supra*, 41 Cal.4th at pages 75 and 76, the California Supreme Court rejected the very argument defendant makes here on the grounds we have.

Thus, it is clear that the language defendant points to was directed at the *entire Wheeler/Batson three-step process* and not just the first, or prima facie showing, step. Moreover, the high court made clear that the relevant facts in *Johnson* gave rise to an inference of discriminatory purpose, which the facts here did not.

Equally unhelpful to defendant's position is language in *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*),[22] also cited by defendant, that "a *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false." (545 U.S. at p. 252.) What preceded this was the following, "[W]hen illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives." (*Ibid.*) As is apparent from the foregoing, *Miller-El* dealt with the third stage of the *Wheeler/Batson* analysis. (*Miller-El, supra*, at p. 240.) In making a reference to the appellate court in the quoted statement above, the

---

[22] Of 108 prospective jurors, 20 were African-American, half of whom were peremptorily excused by the prosecutor, nine were excused for cause or by agreement of the parties and one served on the jury. (*Miller-El, supra*, 545 U.S. at pp. 240–241.) The high court noted that the prosecutor's peremptories were used to exclude 91 percent of the African-Americans, which the court commented was "unlikely" "[h]appenstance." (*Ibid.*) The court also engaged in a comparative analysis with unexcused jurors and found its results, as well as the prosecutor's misinterpretation of statements by later excused venirepersons demonstrated that the prosecutor's stated reasons for excusing those he did were pretextual. (*Id.* at pp. 241–250.) Finally, the court concluded that other actions engaged in by the prosecutor, as well as the long-standing policy of the prosecutor's office to exclude African-Americans from juries, demonstrated purposeful discrimination despite the prosecutor's proffer of racially neutral reasons for excusal. (*Id.* at pp. 253–266.)

high court was referring to the Court of Appeal's rationalizing the prosecutor's use of peremptories in a way not supported by the record, nor by law, in order to uphold the denial of the *Wheeler/Batson* challenge. (*Miller-El, supra,* at p. 250.) In fact, the next sentence after the above cited one is, "The Court of Appeals's . . . substitution of a reason for eliminating [one of the excused prospective jurors] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions." (*Id.* at p. 252.) Thus, this language in *Miller-El*, like that in *Johnson* and the authorities it cites, has nothing whatsoever to do with our task upon review of a trial court's finding that a prima facie case had not been made out.

## DISPOSITION

The judgment is affirmed.

Gaut, J., and King, J., concurred.

Appellant's petition for review by the Supreme Court was denied November 19, 2009, S176424. Kennard, J., was of the opinion that the petition should be granted.