Filed 7/14/16  P. v. Alexander CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B263214 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA134545) |
| v. | |
| RICKY MACK ALEXANDER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, Andrew S. Pruitt, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Ricky Mack Alexander (defendant) asks us to decide whether the trial court wrongly denied his *Batson*/*Wheeler*[1] motion. In making the motion, defense counsel objected because the prosecutor "excused every Black male on the jury" and a moment later remarked, "That's all she's excused is males of color. And there are no more males of color in the audience." The trial judge ruled the defense failed to establish a prima facie case of discrimination and denied the motion; the final jury empanelled, including the alternates, comprised ten Latino jurors, two Asian jurors, one White juror, and two Black jurors. Following binding California authority, we uphold the denial of defendant's *Batson*/*Wheeler* motion.

I

A

In light of the sole contention of error before us, we need not dwell on the facts of defendant's offense. Suffice it to say he was arrested after repeatedly pushing his then-girlfriend to the floor and trying to "stomp" her with his feet late in the evening on June 7, 2014. She suffered cuts, scratches, and bruises on her face and body. The Los Angeles County District Attorney charged defendant with a violation of Penal Code section 273.5, subdivision (f)(1): injuring a cohabitant or girlfriend after a prior conviction. A jury convicted defendant after a four-day trial, and he admitted prior conviction and prior prison term allegations pled in the information against him. The trial court sentenced defendant to ten years in prison.

---

[1] *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*). Although defendant cited only *Wheeler* when making his motion, we treat such a motion as a motion under *Wheeler* and *Batson* on appeal, and we refer to the defense motion as a *Batson*/*Wheeler* motion throughout this opinion. (*People v. Chism* (2014) 58 Cal.4th 1266, 1309, fn. 14.)

B

The facts concerning jury selection are, of course, central to our resolution of the appeal. Jury selection took place over the course of roughly a day and a half, and after several jurors were excused for cause or by stipulation of the parties, 17 jurors were excused by way of peremptory challenges—eight by the prosecution and nine by the defense. The prosecution's peremptory challenges to four prospective jurors are the basis of the defense's contention that the challenges (more colloquially, the "strikes") were discriminatory.[2]

The prosecution first struck Juror 3700, a Black woman who was married, had never before served on a jury, and worked at a nonprofit helping the mentally disabled. When the prospective jurors were asked whether they had any unfortunate experiences with law enforcement, Juror 3700 said yes and explained her brother had been detained and arrested seven years ago for something he didn't do. But she agreed she could set that experience aside and be fair to all the parties in the case.

With its next peremptory strike, the prosecution excused Juror 6397, a Latino man who was unmarried with two minor children, had never served on a jury, and worked with computers as an infrastructure analyst. He reported his hobbies were playing basketball and travelling, and he reported no unfortunate experiences with law enforcement.

The prosecution used its third peremptory challenge on Juror 2152, an unmarried Latino man who had no prior jury experience and worked as a "plan worker" for the city of Compton. Juror 2152 also responded affirmatively to the question about unfortunate

---

[2] Later during jury selection, the defense made a second *Batson*/*Wheeler* motion in connection with the exclusion of a fifth juror, identified by defense counsel as "another Black person." In his briefing on appeal, defendant does not challenge (or even mention) the exclusion of this juror or the trial court's denial of this second *Batson*/*Wheeler* motion. Nevertheless, we believe the facts concerning the second motion provide some further context for the proceedings involving the ruling defendant does challenge on appeal, and we therefore summarize *infra* the circumstances of this second motion as well.

experiences with law enforcement, explaining he was at a barbeque five years ago and Los Angeles Police Department officers "showed up and started searching us [and] slammed me against my truck." When the trial court initially asked whether he could be fair to the officers that would testify in the case against defendant, Juror 2152 said he did not think he could. The trial court, however, asked Juror 2152 to "hold off on concluding that," and after additional instructions and comments by the court on the role and responsibilities of jurors, Juror 2152 said he thought he could be fair if selected to serve.

The prosecution used its next peremptory challenge, its fourth, to excuse Juror 8633, a Black man who was unmarried with three children, had never served on a jury, and was employed as both a postal worker and part-time longshoreman. Juror 8633 also reported a negative experience with law enforcement officers, namely, an incident where a sheriff's deputy pulled him over to search his car for drugs and said "all Braggs [the juror's last name] get pulled over and the car searched." When the trial court asked whether he could set that experience aside and be fair to both sides, Juror 8633 responded, "Yes, sir."

After the prosecutor used her fourth peremptory challenge to excuse Juror 8633, defense counsel moved for a mistrial under *Wheeler* during the following colloquy with the court at sidebar:

> [Defense Counsel]: Yes. I want to move for a mistrial based on *Wheeler*. She excused every Black male on the jury.
>
> The Court: She exercised four peremptories. The first one was a Black male [actually, a Black female]. The second, a male Latino. The third, a male Latino. And the fourth was a Black male. I don't think that there's been a pattern established—
>
> [Defense Counsel]: That's all she's excused is males of color. And there are no more males of color in the audience.
>
> The Court: I disagree with that. I don't think there's been a pattern established simply because she's exercised four peremptories and they are

4

all males. So I'm not going to require her to give a reason. However, [prosecutor], if you want to put on the record your reasons.

[Prosecutor]: The first person I kicked off was a female. She stated her brother was wrongfully arrested. She seemed very upset with officers. The second person I excluded was male. I believe [he was] the one that seemed to be very young and had no real life experiences. And I want someone with life experience on the jury. The third was a male as well, and he said he was slammed onto an L.A. police car, and he still had feelings about that even though he said he could be fair, he still seemed upset about the whole issue. And the last male said he got pulled over and searched because 'all Braggs get pulled over and searched.' I do not want people who have these bad feelings against L.A. police officers.

The Court: Okay.

The prosecutor and defense attorney left sidebar and resumed jury selection in open court. After each attorney excused one additional juror, the court and counsel examined additional jurors in the jury pool who were not questioned during the initial round of jury selection. Among the questions the prosecution asked the jurors during voir dire was whether there would have to be a certain level of violence in a domestic dispute before it warrants criminal prosecution. Juror 8020 responded, "I think like a mark or something," meaning physical contact that would leave a mark on a person's body. The prosecutor then asked whether Juror 8020 could follow the law if instructed that offensive or harmful touching without leaving any mark was sufficient, and Juror 8020 said yes.

With this second round of voir dire complete, the prosecution and the defense stipulated to excusing one of the new group of jurors for cause and then resumed the process of exercising peremptory challenges. The prosecution used two peremptories and the defense used three, at which point the prosecution accepted the panel as constituted. The defense then exercised another peremptory strike, and the prosecution responded by

5

using one of its peremptories to excuse the juror seated as a result of the defense's strike, Juror 8020.

After the prosecution struck Juror 8020, the defense made a second *Wheeler* motion at sidebar:

> [Defense Counsel]: Another Black person excused.
>
> The Court: So are you making a *Wheeler* motion?
>
> [Defense Counsel]: Yes.
>
> The Court: So what's the pattern?
>
> [Defense Counsel]: Excusing the Black people. The[re] isn't one on the jury.
>
> The Court: I have that she used 8 peremptory challenges and three of the eight have been Blacks, if Juror Number 8 is Black. I don't think there's been a pattern.
>
> [Defense Counsel]: I just wanted to make a record.
>
> The Court: Did you want to give a reason, although I'm not going to require it, for Juror [8020]?
>
> [Prosecutor]: I believe she stated she needed there to be a level of violence before it's criminal.
>
> [Defense Counsel]: There does have to be.
>
> The Court: So that's a race neutral reason. So we'll move forward.

A new juror joined the panel in place of Juror 8020, and both sides accepted the panel as constituted. The trial court designated three additional jurors as alternates and then excused all the jurors for the weekend, with trial to begin the following week. When the parties next appeared in court, the trial judge noted the defense had made two *Batson*/*Wheeler* motions and stated it accordingly wanted to note for the record the

6

composition of the jury including the alternates: ten Latinos, two Blacks, two Asians, and one White juror.[3]  The record before us also indicates defendant is a Black man.

II

We confront just one issue: whether the trial court's denial of defendant's (first) *Batson*/*Wheeler* motion warrants reversal of the judgment or a remand for further proceedings.  In giving our answer, however, we must address several discrete points of law: can a defendant pursue a *Batson*/*Wheeler* theory that was not clearly articulated in the trial court; what constitutes a "cognizable group" for *Batson*/*Wheeler* purposes under California law; what is the proper standard by which a trial court must evaluate whether a party has made out a prima facie case at the first stage of a *Batson*/*Wheeler* inquiry, and is a pattern of discrimination *required*; and, ultimately, does the evidence in the record before us sufficiently establish a prima facie case?  For reasons we shall explain, California Supreme Court precedent does not permit us to evaluate whether the defense established a reasonable inference the prosecution intentionally discriminated against "males of color" generally, and we come to the independent judgment the defense failed to raise an inference the prosecution's peremptory challenge against a Black male juror was intentionally discriminatory.  We therefore uphold the denial of defendant's *Batson*/*Wheeler* motion.

---

[3]   Neither the trial court nor the parties provided any further description of the composition of the jury or of the full venire from which it was selected.  We are therefore unaware of the racial makeup of the 12-member panel excluding the alternates.  Similarly, while there are indicia in the record of the gender of certain jurors based on those jurors' statements about having a husband or a wife, these statements are not sufficiently reliable for us to draw definitive conclusions; after all, a man may have a husband and a woman may have a wife.  (*Obergefell v. Hodges* (2015) 135 S.Ct. 2584.)  We are, however, reasonably certain that the jury included at least one woman; she identified herself as a stay-at-home mom during the course of jury selection.

A

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" (*Foster v. Chatman* (2016) ___ U.S. ___, ___ [136 S.Ct. 1737, 1747] (*Foster*); *Johnson v. California* (2005) 545 U.S. 162, 169, fn. 5 (*Johnson*); *People v. Chism*, *supra*, 58 Cal.4th at p. 1339.) Under *Batson* and *Wheeler*, such discriminatory strikes violate both the Federal constitutional guarantee of equal protection of the laws and the right to a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*People v. O'Malley* (2016) 62 Cal.4th 944, 974; see also *Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)

Cases that decide *Batson*/*Wheeler* claims often begin with an observation that the three-stage burden shifting framework used to evaluate such claims is now familiar. (See, e.g., *People v. Scott* (2015) 61 Cal.4th 363, 383 [the "now familiar *Batson*/*Wheeler* inquiry"] (*Scott*); *People v. Williams* (2013) 56 Cal.4th 630, 649 (*Williams*).) That is true, but we will describe it briefly.

"'First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race [or other protected category] discrimination.'" (*People v. O'Malley*, *supra*, 62 Cal.4th at p. 974, quoting *People v. Manibusan* (2013) 58 Cal.4th 40, 75; accord, *Foster*, *supra*, 136 S.Ct. at p. 1747.) Courts apply this framework to decide whether, under all the circumstances of a case, the presumption that a prosecutor uses peremptory challenges in a constitutional manner has been overcome. (*Williams*, *supra*, 56 Cal.4th at pp. 653-654.)

B

As *Batson* and *Wheeler* explain, a party may object that a peremptory strike used on a prospective juror is impermissibly discriminatory only when the juror excused is a member of a "cognizable group." (*Batson*, *supra*, 476 U.S. at p. 96 ["defendant first must show that he is a member of a cognizable racial group, [citation], and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"];[4] *Wheeler*, *supra*, 22 Cal.3d at p. 280 [party "must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule"]; see also *People v. Farnam* (2002) 28 Cal.4th 107, 135 [citing cases].) Section 231.5 of the Code of Civil Procedure, governing peremptory challenges, defines such cognizable groups to include those characteristics listed in section 11135 of the Government Code, namely, "race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability." (Gov. Code, § 11135, subd. (a).) We therefore proceed to discern the group membership grounds defendant identified as the basis of his *Batson*/*Wheeler* motion in the trial court and to decide whether the groups identified do in fact constitute cognizable groups under California law.

---

[4] Subsequent cases decided by the high court have expanded the circumstances under which a party may object to unlawful discrimination in jury selection notwithstanding the more limited and race-focused language initially used in *Batson*. (See generally *People v. Harris* (2013) 57 Cal.4th 804, 865 (conc. opn. of Liu, J.) [citing cases].) For instance, in *Powers v. Ohio* (1991) 499 U.S. 400, the Supreme Court held a criminal defendant may object to peremptory strikes as discriminatory even if the defendant and the excluded prospective juror do not share the same race. (*Id.* at p. 415 ["To bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service"].) Later in *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127, the Court held use of peremptory strikes to discriminate on the basis of gender is just as impermissible as discrimination on the basis of race. (*Id.* at pp. 128-129.)

Our Supreme Court in *People v. Cunningham* (2015) 61 Cal.4th 609 (*Cunningham*) highlighted the importance of clearly identifying the basis for a *Batson*/*Wheeler* challenge during trial court proceedings.  The Court concluded a defense attorney who said only "*Batson* again" when raising an objection in the trial court to the prosecution's use of a peremptory strike had forfeited the right to challenge on appeal the trial court's ruling on that strike.  (*Id.* at p. 662.)  The Court explained "[t]he failure to clearly articulate the *Batson*/*Wheeler* objection to the peremptory challenge against [the juror] forfeited the issue for appeal."  (*Id*. at p. 662; accord, *People v. Lewis* (2008) 43 Cal.4th 415, 481, overruled on other grounds as stated in *People v. Black* (2014) 58 Cal.4th 912, 919-920.)

This rule—the basis of a *Batson/Wheeler* objection must be clearly articulated in the trial court to press the claim on appeal—makes good practical sense and comports well with the more general rationale for applying forfeiture principles.  A clear, contemporaneous objection encourages sufficient and proper development of the record, and a properly developed record is especially critical to review of *Batson*/*Wheeler* claims where many of the key facts (e.g., the race or gender of prospective jurors) will not appear in the record absent an affirmative effort by the trial court or the parties to place them there.  (*People v. Welch* (1993) 5 Cal.4th 228, 236 ["Traditional objection and waiver principles encourage development of the record and a proper exercise of discretion in the trial court"]; see also, e.g., *People v. Neuman* (2009) 176 Cal.App.4th 571, 581-582 [defense counsel's failure to make a record in the trial court deprived Court of Appeal of opportunity to know how many members of cognizable group were prospective jurors or selected to serve, and thus, prevented evaluation of claim of racial disparity in use of peremptory strikes].)

Here, defendant's trial attorney clearly articulated two ostensible bases, i.e., cognizable groups to which excused jurors belonged: Black males and "males of color."[5] On appeal, and presumably aware of authority we will soon discuss that indicates one of these two categories is not a valid cognizable group for *Batson*/*Wheeler* purposes, defendant attempts to abandon the actual articulation of the grounds for the *Batson*/*Wheeler* motion and argues instead that counsel's motion should be construed as an objection to strikes against *five* cognizable groups: "males, African Americans, African American males, Hispanics and Hispanic males." He appears to believe that he may invoke any protected characteristics of the excused jurors that are apparent in the record regardless of whether counsel actually identified those characteristics as the asserted ground on which the prosecution was discriminating. As *Cunningham* makes clear, that is not the way it works.

Defense counsel made no specific reference at all to Latinos, much less an assertion that the prosecution was specifically discriminating against Latinos or Latino men to keep them off the jury. Similarly, defense counsel's statements when making his *Batson*/*Wheeler* objection in no way clearly articulated a contention that the prosecution was discriminating against men as a group in favor of women jurors. While defendant points to counsel's "[t]hat's all she's excused is males of color" comment (which came only as an attempted retort when the trial court highlighted a potential infirmity with the defense attorney's initial claim of discrimination against Black men), that statement must be evaluated on its own clear terms and not as invoking the different cognizable groups of Latinos or men overall. (See *Gray v. Brady* (1st Cir. 2010) 592 F.3d 296, 305, fn. 5 ["We do not doubt, of course, that either African-Americans or Hispanics constitute a

---

[5]     Had defendant challenged the trial court's denial of his second *Batson*/*Wheeler* motion in this appeal, we would conclude a third cognizable group was also at issue: Black jurors, whether male or female. Defendant appears to have intentionally decided to forego advancing such an argument, and we therefore do not consider whether the defense put forward sufficient evidence to establish an inference of discrimination against Black jurors generally.

11

'cognizable group' for *Batson* purposes. But, as Gray himself argues, that is a different question from whether 'minorities' constitute such a group"]; see also *People v. Cleveland* (2004) 32 Cal.4th 704, 734 [claim prosecution excluded prospective jurors because they were Black women not cognizable on appeal where defendant objected the prosecutor excluded the jurors because of their race but not because of their gender].)

Indeed, defendant's attempt to shift theories on appeal highlights the very problem the clear articulation rule is intended to prevent: the absence of key information in the record that we believe would be present if there were a clear assertion in the trial court that the prosecution was discriminating as to the cognizable group of men generally or to Latinos. The parties placed very little information on the record about the number of men and women in the jury pool and the gender breakdown of those excused and selected to serve. We have no reliable information about the race or gender of the prospective jurors that were the target of the prosecution's three other peremptory strikes. The trial court took care to note the racial composition of the jury at the conclusion of jury selection but said nothing about its gender composition. Further, defense counsel made no additional efforts to shore up the record after making the "all she's excused is males of color" comment, and indeed, when making his second *Batson* motion counsel did not reprise the "males of color" objection, highlight the absence of males generally on the jury, or complain about the use of strikes against Latinos. Instead, counsel objected on the basis of "[a]nother Black person excused." The state of the record leaves us convinced defense counsel did not clearly invoke, and neither the prosecution nor the trial court understood his *Batson*/*Wheeler* motion to encompass, the expanded number cognizable groups defendant now identifies on appeal. Under *Cunningham*, we therefore address only the *Batson*/*Wheeler* claims that were clearly articulated: the contention that the prosecution intentionally discriminated against Black men and against males of color.

2

We have no difficulty concluding Black men are a cognizable group for *Batson*/*Wheeler* purposes. Our Supreme Court has repeatedly held Black *women* are a

12

cognizable group for *Batson*/*Wheeler* purposes (*People v. Bell* (2007) 40 Cal.4th 582, 597 (*Bell*) disapproved on another ground in *People v. Sanchez* (June 30, 2016, S216681) ___Cal.4th.___ [2016 WL 3557001]; *People v. Motton* (1985) 39 Cal.3d 596, 605-606), and we can fathom no reason why Black women would be a cognizable group while Black men would not.  Treating Black men as a cognizable group also accords with *People v. Gray* (2001) 87 Cal.App.4th 781, a case in which Division Six of this court did just that in analyzing whether the defendant adequately stated a prima facie case of discrimination in jury selection.

On the other hand, we have found no case that holds "males of color" or "people of color," at least when articulated in that fashion, are a cognizable group for purposes of a *Batson* or *Wheeler* analysis.  Having said that, we are aware of out-of-state authority that has permitted a defendant to aggregate different races that individually would constitute cognizable groups into one larger group that is cognizable for purposes of a *Batson* analysis.

The best example is then-Judge Sotomayor's opinion for the court in *Green v. Travis* (2d Cir. 2005) 414 F.3d 288 (*Green*).  In that case, which came to the Second Circuit on habeas review, the prosecution used peremptory challenges to excuse two Black men, two Hispanic women, and one Black woman.  (*Id.* at p. 291.)  The defense attorney objected, and although conceding the strikes comprised individuals of two different races, stated his belief that the prosecution was nevertheless "discriminating on race which is absolutely forbidden to be done."  (*Id.* at p. 292.)  The trial judge denied the *Batson* motion, and the Appellate Division of the New York Supreme Court affirmed, holding "'minorities in general do not constitute a cognizable racial group.'"  (*Ibid.*)

Before the Second Circuit, the State of New York argued Blacks and Hispanics could not be combined to constitute a cognizable racial group without running afoul of United States Supreme Court precedent.  The court rejected the argument, explaining the decision in *Powers v. Ohio*, *supra*, 499 U.S. 400 "dramatically lessened the import of *Batson*'s 'cognizable racial group' language" because it granted criminal defendants third party standing to raise equal protection claims of prospective jurors and because it made

clear that a racially discriminatory peremptory strike of even one juror violates the Equal Protection Clause. (*Green*, *supra*, 414 F.3d at p. 297.) Thus, concluded the court: "[A] defendant raising a *Batson* claim of purposeful racial discrimination does not have to demonstrate that all venirepersons who were peremptorily excused belong to the *same* 'cognizable racial group.' *Powers* makes clear that the only continuing relevance of *Batson*'s 'cognizable racial group' language is the requirement that a defendant alleging purposeful racial discrimination . . . must demonstrate that a peremptorily excused venireperson was challenged by reason of being a member of *some* 'cognizable racial group.'" (*Id.* at pp. 297-298, italics in original.)

The Seventh Circuit, in an opinion by Judges Rovner and Posner with Judge Kanne in dissent, also addressed the viability of a *Batson* claim predicated on aggregation of members of more than one cognizable racial group. (*United States v. Stephens* (7th Cir. 2005) 421 F.3d 503, 513-514 (*Stephens*).) The defense made no *Batson* objection during jury selection, but the trial judge later sua sponte raised concerns that "the government's peremptory challenges appeared to have been disproportionately exercised against prospective non-white jurors." (*Id.* at p. 510.)

On appeal, the *Stephens* court considered whether the prosecution's peremptory strikes evinced a pattern of striking members of a cognizable group, including Blacks, Latinos, and Asians. (*Id.* at p. 513.) In particular, the majority first considered the use of two peremptory strikes against Blacks and noted the two challenges eliminated 66% of the Black prospective jurors. (*Ibid.*) The majority also considered the prosecution's use of its remaining peremptory challenges and found it significant that "all of the six peremptory challenges were used against members of minority racial groups," eliminating 75% of the Latinos on the venire and the sole Asian venire member. (*Ibid.*) The majority found a prima facie case of discrimination based in part on the pattern established by the prosecution's strikes, reasoning that the "use of challenges to stack the jury with one race is no more constitutional than the use to eliminate one race." (*Id.* at p. 514.) The majority dismissed the dissent's complaint that it was "simply aggregating small numbers to create a pattern" and explained that "[t]he exclusion of nearly all

14

persons of color from the trial of an African-American defendant looks no less suspicious to the community . . . because the prosecutor targeted all persons of color rather than solely those of one ethnicity."[6] (*Id.* at pp. 514-515; see also *id.* at p. 518; but see *Gray v. Brady*, *supra*, 592 F.3d at p. 306 [rejecting contention that "minorities" are a "cognizable group" because it lacked factual support in the record and because it was "open to serious question" whether class of "non-whites" is cohesive enough to warrant recognition as a group].)

Stepping back from the doctrinal justifications, *Green* and *Stephens* give effect to the notion that using peremptory strikes in an effort to engineer an all White jury is just as pernicious as the use of peremptory challenges to exclude only Latinos.[7] The rationale in these cases also seems to reflect concern that confining *Batson* analysis to a single racial group at a time provides insufficient protection against purposeful racial discrimination, at least when that discrimination takes the form of efforts to secure the presence of jurors of a preferred race on a jury to be empanelled.[8]

---

[6] A Court of Appeal decision we will mention again in a moment, *People v. Neuman*, *supra*, 176 Cal.App.4th 571, reads *Stephens* not as an example of a court aggregating individual cognizable racial groups when analyzing whether there is evidence supporting an inference of discrimination but as an instance of a court's "use of excusals against members of a second minority group as evidence to support a prima facie showing of discrimination against members of a first minority group [Blacks]." (*Id.* at p. 577.) This reading, however, cannot be squared with the language of the *Stephens* majority opinion, key portions of which we have already quoted. Indeed, even the dissenting judge in *Stephens* recognized the majority opinion "aggregates the statistically disproportionate strikes against members of several minority groups to find a 'pattern' . . . ." (*Stephens*, *supra*, 421 F.3d at p. 523 (dis. opn. of Kanne, J.).)

[7] The point is equally valid when substituting other racial groups for those used as examples.

[8] Assume, for example, a jury venire includes 30 prospective jurors, two of whom are Black, one who is Latino, two who are Asian, and the remainder of whom are White. A party who wanted to ensure only Whites serve on the jury might use peremptory challenges against the Black, Latino, and Asian jurors. Such strikes, if assessed viewing the races of the jurors in the aggregate (i.e., whether there is a reasonable inference "people of color" are being stricken), presents a relatively strong case of a pattern that

15

Of course, aggregating discrete cognizable groups when determining whether there exists a prima facie case of purposeful discrimination may trigger potentially thorny questions or practice or proof, questions that *Green* and *Stephens* do not explicitly address. For instance, before concluding a pattern indicative of discrimination exists, should a court demand more probative evidence of a pattern when racial groups are aggregated than it does when a single cognizable group is at issue? After all, at least in a diverse city like Los Angeles, striking several prospective jurors who are people of color would seem to stand a greater chance of occurring by happenstance than would the same number of strikes used solely against one particular group. In addition, if a *Batson*/*Wheeler* objection can be made to challenge strikes against members of different racial groups in the aggregate, at what level of generality or specificity must such an objection be made? Would an objection to exclusion of "people of color" suffice, or must an objecting attorney more precisely specify the individual racial (or gender) groups alleged to be the basis of opposing counsel's asserted discrimination?

In the end, we have no occasion to wrestle with these questions, or to decide ourselves whether "males of color" is a cognizable group for *Batson*/*Wheeler* purposes, because a 2009 California Supreme Court opinion resolves the issue for us. (*People v. Davis* (2009) 46 Cal.4th 539 (*Davis*); see also *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) The court in *Davis* rejected the defendant's argument that the trial court erred "by ruling that 'people of color' is not a cognizable group for *Wheeler* analysis." (*Davis*, *supra*, 46 Cal.4th at p. 583.) The *Davis* court's discussion of the issue was brief, resting on the observation that "[n]o California case has ever recognized 'people of color' as a cognizable group." (*Ibid.*)

At least one other court has recognized that *Davis* is binding and compels rejection of "people of color" as a cognizable group. The Court of Appeal in *People v. Neuman*,

---

would support an inference of discrimination. However, if assessed only individually with each racial group in its respective silo, striking only one or two jurors presents a relatively weaker case for finding a pattern of discrimination, which might ultimately doom efforts to make a prima facie showing.

16

*supra*, 176 Cal.App.4th 571, held, following *Davis*, that defense counsel could not challenge peremptory strikes used against one Black, one Hispanic, and one southeast Asian juror in the aggregate. (*Id.* at p. 574 [affirming trial court ruling that no foundation exists for *Batson*/*Wheeler* argument "'where you have only a single challenge as to each of three different cognizable groups'"]; see also *id.* at p. 579.) The Court of Appeal acknowledged *Green* had reached a contrary conclusion, but it concluded "[u]nlike *Davis*, *Green* does not bind us." (*Id.* at p. 579.)

We likewise follow *Davis* here. Although *Davis* rejected "people of color" as a cognizable group and here we are presented with a statement by trial counsel regarding "males of color," the difference is immaterial for purposes of determining whether *Davis* controls. Limiting people of color to one gender does not sufficiently transform the nature of the objection, which would still aggregate several racial groups for analysis. And our Supreme Court's observation in *Davis* equally applies here: no other California case of which we are aware has recognized "males of color" as a cognizable group. Thus, we review the trial court's *Batson*/*Wheeler* prima facie case ruling only as to the sole cognizable group defense counsel clearly identified, Black men.


C

As we have already said, the United States and California constitutions forbid striking even a single juror for a discriminatory purpose. (See, e.g., *Foster*, *supra*, 136 S.Ct. at p. 1747.) The record indicates one Black male prospective juror, Juror 8633, had been stricken by the prosecution when defendant made his *Batson*/*Wheeler* motion. Based on defense counsel's uncontradicted representation at the time, we proceed on the understanding there were no other Black men (or other males of color) remaining in the jury pool after Juror 8633 was excused. The trial court's comments in response to the *Batson*/*Wheeler* motion indicate the court likely employed the wrong legal standard in evaluating whether the defense had made out a prima facie case, and we accordingly exercise our own independent judgment to decide that issue. We conclude the evidence was insufficient to establish a prima facie case, especially in light of the obvious reason

17

in record for the prosecution's strike: the prior negative experience with law enforcement Juror 8633 reported.

1

Ordinarily, a reviewing court accords deference to a trial judge's determination of whether a *Batson*/*Wheeler* movant has established a prima facie case of purposeful discrimination, owing to the judge's opportunity to see and hear the participants first hand. (*People v. Jenkins* (2000) 22 Cal.4th 900, 993-994; *People v. Rushing* (2011) 197 Cal.App.4th 801, 809; see also *Williams*, *supra*, 56 Cal.4th at p. 650.) Where, however, the record suggests a trial court has determined the existence vel non of a prima facie case by applying an incorrect legal standard, no deference is due and we judge the matter independently. (*Cunningham*, *supra*, 61 Cal.4th at p. 664; *Davis*, *supra*, 46 Cal.4th at pp. 582-583; *Bell*, *supra*, 40 Cal.4th at p. 597 ["Where it is unclear whether the trial court applied the correct standard, we review the record independently . . ."].)

Under *Batson*, *Wheeler*, and their progeny, evidence of a pattern in a party's use of peremptory strikes that is suggestive of discrimination, either because the party has struck most or all members of the identified group from the venire or because the party has used a disproportionate number of strikes against the group, is particularly relevant in determining whether a prima facie case exists. (*Batson*, *supra*, 476 U.S. at p. 97; *Wheeler*, *supra*, 22 Cal.3d at p. 280; see also, e.g., *Scott*, *supra*, 61 Cal.4th at p. 384.) But precedent is equally clear that while such pattern evidence may aid in making out a prima facie case, it is not indispensible. (*Cunningham*, *supra*, 61 Cal.4th at p. 664; *People v. Avila* (2006) 38 Cal.4th 491, 553-554 (*Avila*).) Rather, the question is whether "the sum of the proffered facts gives rise to an inference of discriminatory purpose." (*Johnson*, *supra*, 545 U.S. at p. 169; accord, *Scott*, *supra*, 61 Cal.4th at p. 384.)

While the record indicates the trial judge conscientiously presided over jury selection, the court's comments after counsel moved for a mistrial under *Batson*/*Wheeler* were unquestionably and unusually focused on whether the defense could show a pattern in the use of peremptory strikes that would suggest discrimination. Immediately after

18

counsel made the motion, the court responded by both noting the race of the jurors that had been excused by the prosecution and stating "I don't think that there's been a pattern established."  When defense counsel protested by referencing "males of color," the trial court again stated it did not believe a pattern had been established and then said "[s]o I'm not going to require [the prosecutor] to give a reason."  Of course, asking counsel whether he could identify a pattern is appropriate, and perhaps even to be encouraged. But the court's repeated focus on pattern evidence—and especially its use of the word "so" (indicating a causal connection) when stating it would not require the prosecution to give a reason—indicates it considered such evidence not as merely relevant but as a sine qua non of a prima facie case.[9]  Our Supreme Court's conclusion under similar circumstances in *Cunningham* is therefore equally applicable here:  "[I]n finding defendant failed to make a prima facie case of racial discrimination, the trial court appears to have used an incorrect standard, finding 'no systematic pattern of exclusion,' rather than no inference of discriminatory purpose.  (See, e.g., *Avila*, *supra*, 38 Cal.4th at pp. 554-555 [trial court was under the mistaken impression that only pattern of discrimination through multiple excusals could make prima facie showing].)  We therefore independently review the record to '"resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror on the basis of race."' (*Id.* at p. 554.)"  (*Cunningham*, *supra*, 61 Cal.4th at p. 664, italics in original.)

2

In assessing whether defendant established a prima facie case of intentional discrimination, we are mindful that it is a "low threshold" the defendant must meet (*Scott*, *supra*, 61 Cal.4th at p. 384) and that the burden should not be "so onerous that a

---

[9]     Considering the court's comments after defense counsel made the second *Batson* motion would only serve to corroborate these indications that the court believed evidence of a pattern is required to establish a prima facie case.  The court asked counsel whether he was making a *Wheeler* motion, and when he said he was, the court immediately responded, "So what's the pattern?"

19

defendant would have to persuade [a court]—on the basis of all the facts, some of which are impossible for the defendant to know with certainty—that the challenge was more likely than not the product of purposeful discrimination." (*Johnson*, *supra*, 545 U.S. at p. 170). We consider the full record and all the circumstances. (*Scott*, *supra*, 61 Cal.4th at p. 384 ["totality of the relevant facts"]; *Williams*, *supra*, 56 Cal.4th at pp. 653-654 [all the circumstances of the case].)

Prior decisions have identified a variety of considerations or types of evidence that are relevant in assessing whether a prima facie case has been proven. Of course, one such type of evidence that we have already described is whether the use of peremptory strikes discloses a pattern suggestive of discrimination. (*Ante*, at p. 18.) We also consider, among other things:

– Whether, although not necessary, the defendant and the jurors excused by way of a peremptory strike are of the same race (see, e.g., *Bell*, *supra*, 40 Cal.4th at p. 597, quoting *Wheeler*, *supra*, 22 Cal.3d at pp. 280-281);

– Whether the victim of a crime and the majority of jurors remaining after the use of peremptory challenges are of the same race (see, e.g., *Scott*, *supra*, 61 Cal.4th at p. 384);

– Whether excused jurors have little in common except for their cognizable group membership (see, e.g., *Cunningham*, *supra*, 61 Cal.4th at p. 664);

– Whether the party exercising peremptory strikes failed to engage the prospective jurors excused in more than desultory voir dire (see, e.g., *Scott*, *supra*, 61 Cal.4th at p. 384);

– The high court's observation in *Batson* of "the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate'" (*Batson*, *supra*, 476 U.S. at p. 96, quoting *Avery v. Georgia* (1953) 345 U.S. 559, 562);

– Whether party accused of improperly exercising peremptory challenges against a cognizable group has passed members of that same group who were then seated on the jury (see, e.g., *Cunningham*, *supra*, 61 Cal.4th at pp. 664-665); and

– Whether there are race-neutral grounds, apparent from and clearly established in the record, that necessarily dispel any inference of bias (see, e.g., *Cunningham*, *supra*, 61 Cal.4th at p. 665; *Scott*, *supra*, 61 Cal.4th at p. 384).

Here, some of these factors do point in the direction of a prima facie case of discrimination. Defendant and Juror 8633 are of the same race. Juror 8633 was also apparently the only Black man in the venire; perhaps that is not as probative of discriminatory intent as it would be if there were a larger sample size from which to draw conclusions, but it is certainly a relevant consideration. (*Bell*, *supra*, 40 Cal.4th at pp. 597-598; *United States v. Vasquez-Lopez* (9th Cir. 1994) 22 F.3d 900, 902 [constitution forbids striking even a single prospective juror for a discriminatory purpose, but "the fact that the juror was the one Black member of the venire does not, in itself, raise an inference of discrimination"].) In addition, there is also *Batson*'s observation about the general nature of peremptory challenges.

Other evidence, however, points decidedly in the opposite direction. There was more than desultory examination of Juror 8633, and indeed, that is what produced the evidence that in our judgment is dispositive. Juror 8633 reported having a prior negative experience with law enforcement (being stopped by the police without good reason), and our Supreme Court has held that is an accepted race-neutral justification for the use of a peremptory strike. (*People v. Montes* (2014) 58 Cal.4th 809, 855; *People v. Turner* (1994) 8 Cal.4th 137, 171, overruled on other grounds in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; see also *Scott*, *supra*, 61 Cal.4th at p. 384.) We are confident this obvious reason, clearly established by the record, dispels any inference of intentional discrimination. Defendant therefore has not satisfied the first stage of the three-step *Batson*/*Wheeler* inquiry.

21

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.



We concur:



TURNER, P.J.



RAPHAEL, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.